Charles W. SULLIVAN, Plaintiff,

v.

Paul TAGLIABUE, et al., Defendants.

Civ. A. No. 92–10915–H.
No. 92–CV–10592.

United States District Court,
D. Massachusetts.

July 29, 1993.

Alan R. Hoffman, Lynch, Brewer, Hoffman & Sands, Boston, MA, Joseph V. Cavanagh, Jr., Blish & Cavanagh, Providence, RI, Joseph L. Alioto, Alioto & Alioto, Bruce J. Wecker, Furth, Fahrner and Mason, San Francisco, CA, for plaintiff.

Robert M. Buchanan, Jr., Sarah C. Columbia, Jeremiah T. O'Sullivan, Choate, Hall & Stewart, Boston, MA, Matthew F. Medeiros, Flanders & Medeiros, Providence, RI, John Vanderstar, Ethan M. Posner, Sonya D. Winner, Covington & Burling, Washington, DC, Joseph W. Cotchett, Frank M. Pitre, Susan Illston, John L. Fitzgerald, Cotchett, Illston & Pitre, Burlingame, CA, for defendants.

## MEMORANDUM

HARRINGTON, District Judge.

■ In conjunction with an action brought by his father, William J. Sullivan, Jr., the Plaintiff Charles W. Sullivan has brought this action for damages against the Defendants,[1] alleging that their enforcement of a National Football League (NFL) rule constituted a violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. The Plaintiff presses this suit both individually and as the assignee of the antitrust claim belonging to Stadium Management Corporation (SMC). In addition, the Plaintiff has alleged state law claims of breach of fiduciary obligations, interference with a prospective advantageous contract, unfair trade practices, and intentional infliction of emotional distress. The Defendants have moved for Summary Judgment on the Plaintiff's antitrust action, arguing that he lacks standing to bring such an action.[2]

William Sullivan was the founder and sole or managing owner of the New England Patriots Football franchise ("Patriots") from 1960 to 1988. In 1987, his son, the Plaintiff, was the sole stockholder of SMC, which owned the stadium at Foxboro, Massachusetts, then called Sullivan Stadium, where the Patriots played and continue to play their

---

1. The Defendants named in this action are the NFL, current NFL Commissioner Paul Tagliabue, his predecessor Pete Rozelle, and the following 21 organizations owning NFL franchises: The Five Smiths, Inc.; Indianapolis Colts, Inc.; Buffalo Bills, Inc.; Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; Cleveland Browns, Inc.; Dallas Cowboys Football Club, Ltd.; PDB Sports, Ltd.; The Detroit Lions, Inc.; Green Bay Packers, Inc.; Houston Oilers, Inc.; Los Angeles Rams Football Co.; Minnesota Vikings Football Club, Inc.; New Orleans Saints, Ltd.; Chargers Football Co.; New York Jets Football Club, Inc.; B & B Holdings, Inc.; Pittsburgh Steelers Sports, Inc.; Tampa Bay Area NFL Football, Inc.; Pro-Football, Inc.; and Seattle Professional Football Club, Inc.

2. The question of antitrust standing is one of law. *Midwest Communications v. Minnesota Twins, Inc.,* 779 F.2d 444, 449 (8th Cir.1985), *cert. denied,* 476 U.S. 1163, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). In previously denying the Defendants' Motion to Dismiss in the instant case, this Court indicated that the Plaintiff's Complaint sufficiently alleged antitrust standing. 795 F.Supp. 56, 58 (D.Mass.1992). On this Motion for Summary Judgment, this Court shall now examine the evidence presented by the Plaintiff to support this allegation. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

home games. That same year, William Sullivan sought to sell a 49 percent interest in the Patriots to an investment banking firm, which was not in the business of football, which, in turn, was to sell the shares of stock to the public. Through this transaction, the Plaintiff, through SMC, concurrently sought refinancing for the stadium. The Plaintiff alleges that SMC would have received a $40 million loan from the investment banking firm pursuant to the public offering of the Patriots' stock.

The Plaintiff contends that the Defendants combined to prevent the sale of Patriots stock by enforcing a league rule that prohibited the sale of the shares of interest of an NFL franchise to any company not engaged in the business of professional football (the "Rule"). This Rule could only have been changed or waived by a vote of three quarters of the NFL owners, a requirement that the Plaintiff argues was itself a restrictive rule of procedure. The Plaintiff alleges that by preventing the sale of stock, the Defendants also effectively blocked the refinancing of the stadium. He further contends that the Defendants intended this result, or, at the very least, were well aware that the stadium refinancing was being sought concurrently with the sale of Patriots' stock to the public and that their actions in prohibiting the sale would necessarily adversely affect SMC. Subsequent to William Sullivan's failed attempt to sell the shares to the public, SMC was forced into bankruptcy. During the bankruptcy proceedings, the Plaintiff received an assignment of all SMC's causes of action, including the antitrust claim he presses here, in consideration of the release of claims against SMC by the Plaintiff.

The Plaintiff claims that, if the sale of the Patriots' stock had gone through, negotiations for the refinancing would have been successfully completed, allowing him to pay off his debts, as well as those of the stadium, and to subsequently make renovations to the stadium. He contends that, consequently, he would still own the stadium, and would have reaped the benefits of the enhanced market value of the stadium as a result of the renovations he intended to make. The Plaintiff also alleges that, in 1987, SMC held a lease from the Patriots which extended until the year 2002, and that, if the sale of stock to the public through the investment banking company had been successful and the renovations completed, the Patriots would have extended the lease for another twenty years.

■ The Plaintiff has brought his action under Section 4 of the Clayton Act, 15 U.S.C. § 15, which confers standing upon private parties to sue for damages under the Sherman Act. Section 4 provides for a private cause of action to enforce a public antitrust law to advance the public interest. This section provides:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15. Although Section 4 appears on its face to provide a cause of action to anyone claiming an injury causally related to an antitrust violation, the Supreme Court has rejected such a literal interpretation of the statute. *See Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 534–35, 103 S.Ct. 897, 906–07, 74 L.Ed.2d 723 (1983); *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 476–77, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (1982). As the Supreme Court has stated:

> An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but "despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable." It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property.

*McCready,* 457 U.S. at 476–77, 102 S.Ct. at 2547 (citation omitted). The Supreme Court has consequently enunciated factors that are to be considered in the determination to con-

fer antitrust standing and which narrow the class of persons entitled to recover private damages under Section 4. *See Associated Gen. Contractors,* 459 U.S. at 535–45, 103 S.Ct. at 907–12. These factors include: (1) a causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicate recovery or complex apportionment of damages. *See id.; see also Lovett v. General Motors Corp.,* 975 F.2d 518, 520 (8th Cir.1992) (listing factors).

■ First evaluating these factors as they apply to the Plaintiff's claims brought on behalf of SMC, the Court notes that the Plaintiff has alleged, and presented evidence of, a causal connection between the application of the Rule and SMC's inability to refinance the stadium because the sale of Patriots' stock to the public was prohibited. The Plaintiff has also alleged an improper motive on the part of the Defendants in that they sought "to restrain and monopolize interstate commerce in professional football" and took the actions they did against SMC in furtherance of that goal. In addition, the Plaintiff has indicated that the Defendants intended to block the refinancing of the stadium by their actions, or at the very least, that such a harm was a foreseeable consequence of the application of the Rule as to the Patriots. The Court consequently finds that the Plaintiff has presented sufficient evidence to raise an issue as to improper motive.[3] The Court also notes that there appears to be no significant risk of duplicate recoveries or danger of complex apportionment in this case, in that the injuries on which the Plaintiff sues are sufficiently distinct from those alleged by William Sullivan, the only other plausible litigant in this matter.[4] William Sullivan has initiated a separate antitrust action against the Defendants.

■ While the above factors arguably militate toward a ruling of standing, the remaining considerations, which are of far more controlling importance under these circumstances, counsel against such a ruling. The first such consideration concerns the nature of the Plaintiff's alleged injury and whether it is of the type that the antitrust laws sought to forestall. *Id.,* 459 U.S. at 538, 103 S.Ct. at 908–09. As the Supreme Court has emphasized, the central interest of the antitrust laws is "in protecting the economic freedom of participants in the relevant market." *Id.,* at 538, 103 S.Ct. at 908. The fact that a plaintiff is not a participant in the relevant market is not in itself dispositive of the standing issue, but such a fact "must be weighed heavily against a grant of standing." *South Dakota v. Kansas City S. Indus.,* 880 F.2d 40, 46 n. 16 (8th Cir.1989), *cert. denied sub nom., South Dakota v. Kansas City S. Ry. Co.,* 493 U.S. 1023, 110 S.Ct. 726, 107 L.Ed.2d 745 (1990). The Plaintiff has alleged that the application of the Rule operated to restrain trade in the market of professional football. In the present case, however, SMC was "neither a consumer nor a competitor" in the market of professional football, nor can it be said that it was "a direct victim of the defendants' coercive practices." *Id.,* 459 U.S. at 539, 540 n. 44, 103 S.Ct. at 909, 910 n. 44. Moreover, there is no indication that the Defendants' actions had any palpable effect on overall competition in the stadia market, in which SMC was a participant. The Plaintiff nonetheless argues that the application of the Rule as to William Sullivan restrained SMC individually, interfering with its ability to compete with other stadia by

---

3. The Court stresses that the improper motive inquiry is not, in and of itself, determinative of antitrust standing. *See Associated Gen. Contractors,* 459 U.S. at 537 & n. 37, 103 S.Ct. at 908 & n. 37. As the Supreme Court has stated, "[t]he availability of the § 4 remedy to some person who claims its benefit is not a question of the specific intent of the conspirators." *Id.,* at 537, 103 S.Ct. at 908 (quoting *McCready,* 457 U.S. at 479, 102 S.Ct. at 2548).

4. While there would exist a risk of duplicate recoveries and a danger of complex apportionment in this case as between the Plaintiff and SMC in light of their seemingly overlapping injuries, the Court will assume that such a problematic consideration can be avoided here, given that the Plaintiff brings his single action for the damages suffered by both.

denying it a means of refinancing. In that the alleged violation had therefore, at most, an indirect and incidental effect upon competition in the stadia market by virtue of its impact on SMC, it cannot be said to be actionable under the antitrust laws, which "were enacted for the protection of *competition*, not *competitors*." *Brunswick Corp. v. Pueblo Bowl–O–Mat., Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (quoting *Brown Shoe v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (emphasis in original)). In sum, SMC's alleged injury was not of the type that the antitrust laws were designed to prevent.[5]

Related to the inquiry concerning the nature of the injury are factors of comparable significance, namely the directness of the injury and the speculative nature of the Plaintiff's damages claim. Here, the Defendants allegedly conspired to create and apply a Rule that prohibited William Sullivan from selling 49 percent of the Patriots to an investment banking firm which would have, in turn, sold shares to the public. As a result, SMC was ostensibly denied the refinancing for Foxboro Stadium that it was negotiating as part of that sale. This refinancing, the Plaintiff contends, would have enabled SMC to pay off its debts, which, in turn, would have allowed the Plaintiff to continue ownership of the stadium, make renovations to it, and get an extension on the lease from the Patriots. It is obvious that any injury suffered by the SMC was only an indirect result of the alleged injury inflicted upon William Sullivan in preventing him from selling Patriots' shares to the public.

Further, the fact that William Sullivan, the party most directly harmed, is pursuing his own antitrust action here diminishes one possible rationale for allowing the Plaintiff to press SMC's separate antitrust claim. As the Supreme Court has stated,

> The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party ... to perform the office of a private attorney general. Denying the [plaintiff] a remedy on the basis of its allegations in [such a] case is not likely to leave a significant antitrust violation undetected or unremedied.

*Associated Gen. Contractors*, 459 U.S. at 542, 103 S.Ct. at 910–11. Here, the SMC's injuries were only a consequence of those injuries suffered by William Sullivan, whose own antitrust action ensures that the alleged violation will be properly remedied.

The indirectness of the SMC's injuries informs the speculative nature of the Plaintiff's damages claim, which he contends is measurable in terms of the enhanced market value of the stadium that would have resulted from the renovation of the stadium. Given that an extended chain of independent events would have had to have occurred to give credence to the Plaintiff's damages claim on behalf of SMC, the Court finds the damages to be, at best, highly speculative. After an evaluation of the Plaintiff's case on behalf of SMC in light of the above factors set forth by the

---

**5.** The Court also finds that SMC's injury was not so "inextricably intertwined" with the injury that the Defendants sought to inflict upon William Sullivan and the professional football market as to confer standing upon him. In general, as the Supreme Court has indicated, an "inextricably intertwined" injury exists where the plaintiff's injury was "a necessary step in effecting the ends of the alleged illegal conspiracy" and "the very means by which it is alleged that [the defendants] sought to achieve their illegal ends." *See McCready*, 457 U.S. at 479–81, 102 S.Ct. at 2548–49; *see also Bodie–Rickett and Assocs. v. Mars, Inc.*, 957 F.2d 287, 291 (6th Cir.1992) (to show that injury is "inextricably intertwined," plaintiff must show that defendants actively manipulated or utilized him in order to harm competitors or participants in the relevant market); *Lovett*, 975 F.2d at 521 (same); *Ostrofe v. H.S. Crocker Co., Inc.*, 740 F.2d 739, 745–46 (9th Cir.1984), *cert. dismissed*, 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985) ("inextricably intertwined" injury exists where Plaintiff's injury was necessary step or means employed by defendants to achieve anticompetitive ends); *Crimpers Promotions Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 292, 294 (2d Cir.1983), *cert. denied*, 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984) ("inextricably intertwined" injury found where boycott of plaintiff was alleged means of eliminating competition in relevant cable market and where plaintiff was most directly injured party). In the present case, however, the denial of stadium refinancing was not a necessary step in effecting and continuing a monopoly on professional football, nor was it the very means by which the Defendants sought to do so. It was merely a secondary consequence of the Defendants' alleged antitrust actions against William Sullivan.

Supreme Court in *Associated Gen. Contractors,* the Court therefore concludes that the Plaintiff lacks standing to bring this suit on behalf of SMC.

Notwithstanding the above analysis, the Plaintiff contends that the Court of Appeals for the Ninth Circuit has already addressed the very issue of standing presented in this case, holding, in *Los Angeles Memorial Coliseum Commission v. NFL,* that an NFL stadium had standing to challenge an NFL rule on antitrust grounds. *See* 791 F.2d 1356, 1364 (9th Cir.1986). In that case, the Los Angeles Coliseum had been left without a major tenant after the Los Angeles Rams football franchise had moved to a new stadium in Anaheim, California. The L.A. Coliseum was consequently looking for a new NFL occupant. Soon thereafter, upon the expiration of his lease with the Oakland Coliseum, Al Davis, the Managing General Partner of the Oakland Raiders franchise, sought to relocate his team to the L.A. Coliseum. The NFL, however, invoked a league rule that prohibited teams from relocating to the home territory of another team without the approval of three-quarters of the 28 NFL member franchises. Insofar as the L.A. Coliseum was within a 75–mile radius of Anaheim, it was still in the Rams' home territory under the league's definition of that term. Over Davis' objection that the rule violated antitrust laws, the NFL member teams voted overwhelmingly against the move, denying Davis the requisite approval and blocking the move.

In holding that the L.A. Coliseum had standing to bring its subsequent antitrust suit in conjunction with the Oakland Raiders against the NFL and its member clubs, the Court of Appeals for the Ninth Circuit emphasized that "the NFL's territorial restraints in this case ... *restrained competition in the 'stadia market' between rival stadia (such as the Oakland Coliseum and the L.A. Coliseum) that seek to secure NFL tenants." Id.* at 1365 (emphasis added). Because the L.A. Coliseum was "a competitor in a market in which competition was restrained directly and foreseeably, if not also intentionally," the court held that the stadium was directly harmed. *Id.* The court was nonetheless careful to limit the reach of its decision:

> We are confident that our ruling will not be misinterpreted as being a broad endorsement of antitrust standing for all parties who might have contracted with the Raiders had they not been restrained in their relocation plans. Football stadia constitute a special market distinguished from those comprised by, say, hotels, laundering establishments, or limousine services, by their indispensable and intimate connection with professional football teams. An injury such as that suffered by the Coliseum in the present case cannot be characterized fairly as an indirect "ripple effect."

*Id.*

In spite of the Plaintiff's arguments to the contrary, this Court declines to interpret *Los Angeles Memorial Coliseum Commission* so broadly as to hold that stadiums always have standing to bring antitrust suits against the NFL by virtue of their relationship to professional football clubs. In commenting on the special connection between the stadia market and professional football, the Ninth Circuit was merely emphasizing the directness with which that particular rule, which necessarily affected the ability of stadiums to attract NFL occupants, impacted the stadia market as compared to various other markets, on which the rule had, at most, a tangential effect. The Rule in the present case has no similarly direct effect upon competition between rival stadia seeking to secure NFL tenants. In fact, in 1987, the year of the attempted sale, SMC had a lease with the Patriots that extended until the year 2002, regardless of the team's ownership, demonstrating that the stadium's ability to lease to the Patriots was not directly impacted by enforcement of the Rule. Instead, the Plaintiff argues that SMC would have received better financing then it had previously enjoyed if the NFL had allowed William Sullivan to sell shares of the Patriots to the public, and that this refinancing would have freed up enough money to pay off debts and make renovations that would have allowed SMC to be more competitive in the market. Such an antitrust injury is far too tangential

**120**

and conjectural to be actionable under the antitrust laws.

For the above reasons, the Court accordingly finds that the Plaintiff lacks standing to bring an antitrust suit for damages on behalf of SMC. The Court also notes that the above analysis applies with even greater force to the Plaintiff's individual antitrust claims. The personal damages that the Plaintiff attributes to the NFL's alleged antitrust violation, which include payment of unnecessary interest and the inability to purchase debt at a discounted rate, merely flow from the alleged injuries to SMC. In that the Plaintiff himself was one step further removed from the alleged antitrust violation than was SMC, the injuries he claims personally are that much more indirect than those claimed on behalf of SMC. Consistent with the above ruling that SMC's injuries were too consequential to support standing, the Court finds that the Plaintiff's personal antitrust injuries, which are merely derivative of SMC's injuries, are too indirect and tangential to support his individual action. *See Associated Gen. Contractors*, 459 U.S. at 545–46, 103 S.Ct. at 912–13.

In conclusion, the Court finds that the Plaintiff Charles Sullivan lacks standing to bring this antitrust action, either individually or on behalf of SMC. The Defendants' Motion for Summary Judgment is therefore granted on that claim. The Court also declines supplemental jurisdiction over his remaining state law claims, and they are therefore dismissed.[6]

6. The Court issued an Order granting Defendants' Motion for Summary Judgment on the federal antitrust claim and declining to exercise supplemental jurisdiction on July 15, 1993, with this Memorandum to follow.